# EXHIBIT A

```
                                                            1

                                           Volume:  I

                                           Pages:   250

                                           Exhibits:  14
```

               UNITED STATES DISTRICT COURT

               DISTRICT OF MASSACHUSETTS

                           C.A. No.  4:18-CV-40197-TSH

                                     1:19-CV-40045-TSH

*******************************

CAMERON HOPKINS,

      Plaintiff,

v.

SEAN E. YI, JACKYMOON CORP.,

GREENMAN-PEDERSEN, INC., AND HILL

& SMITH, INC.,

      Defendants,

AND

J.H. LYNCH & SONS, INC.,

      Defendant/Third-Party

      Plaintiff

v.

NORTHEAST TRAFFIC CONTROL

SERVICES, INC.,

      Third-Party Defendant.

AND

**Page 2**

```
 1   RAMON FELIPE FERREIRA,
 2       Plaintiff,
 3   v.
 4   SEAN E. YI AND JACKYMOON,
 5   CORPORATION,
 6       Defendants.
 7   *********************************
 8
 9       DEPOSITION of DANIEL M. DULASKI, PH.D., P.E., a
10   witness called on behalf of the Defendant, J.H. Lynch
11   & Sons, Inc., taken pursuant to the applicable
12   provisions of the Massachusetts Rules of Civil
13   Procedure 30, before Laurie Donatella, a Court
14   Reporter, via Zoom, Commencing on Wednesday, December
15   15, 2021, at 10:03 a.m.
```

**Page 3**

```
 1   APPEARANCES:
 2
 3       BENJAMIN R. ZIMMERMANN, ESQUIRE
 4       DAVID P. MCCORMACK, ESQUIRE
 5       Sugarman and Sugarman, P.C.
 6       The Prudential Tower
 7       800 Boylston Street, 30th Floor
 8       Boston Massachusetts 02199
 9       bzimmermann@sugarman.com
10       dmccormack@sugarman.com
11       (617) 542-1000
12           Appearing on behalf of the Plaintiff, Cameron
13           Hopkins
14
15       CARLI BUONO, ESQUIRE
16       AUDAI COTE, ESQUIRE
17       Georges Cote Law
18       235 Marginal Street
19       Chelsea, Massachusetts 02150
20       cbuono@georgescotelaw.com
21       acote@georgescoatlaw.com
22       (617) 884-1000
23           Appearing on behalf of the Plaintiff, Ramon
24           Felipe Ferreira (via Zoom)
```

**Page 4**

```
 1   APPEARANCES Continued:
 2
 3       SHANNA M. BOUGHTON, ESQUIRE
 4       PATRICK VOKE, ESQUIRE
 5       McGlinchey Safford
 6       One Boston Place, 29th Floor
 7       Boston, Massachusetts 02108
 8       sboughton@mcglinchey.com
 9       (857) 453-7151
10           Appearing on behalf of the Defendant, Greenman-
11           Pedersen, Inc., (via Zoom)
12
13       CHRISTOPHER R. HOWE, ESQUIRE
14       Campbell, Conroy & O'Neil, P.C.
15       One Constitution Wharf
16       Suite 310
17       Charlestown, Massachusetts 02129
18       chowe@campbell-trial-lawyers.com
19       (617) 241-3000
20           Appearing on behalf of the Defendants, Sean E.
21           Yi and Jackymoon Corp., (via Zoom)
```

**Page 5**

```
 1   APPEARANCES Continued:
 2
 3       JOHN ARONSON, ESQUIRE
 4       Kiernan, Trebach, LLP
 5       40 Court Street
 6       Third Floor
 7       Boston, Massachusetts 02108
 8       jaronson@kiernantrebach.com
 9       (617) 426-3900
10           Appearing on behalf of the Defendant, Hill &
11           Smith, Inc., (via Zoom)
12
13       MATTHEW M. GREENE, ESQUIRE
14       Boyle Shaughnessy Law, P.C.
15       695 Atlantic Avenue
16       Boston, Massachusetts 02111
17       mgreene@boyleshaughnessy.com
18       (617) 451-2000
19           Appearing on behalf of the Defendant/ Third-
20           Plaintiff, J.H. LYNCH & SONS, INC (via Zoom)
```

**Page 6**

APPEARANCES Continued:

THOMAS V. DIGANGI, ESQUIRE
Coughlin Betke, LLP
175 Federal Street
Boston, Massachusetts 02110
tdigangi@coughlinbetke.com
(617) 988-8050
   Appearing on behalf of the Third-Party
   Defendant, Northeast Traffic Control Services,
   Inc (via Zoom)

**Page 7**

INDEX

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Daniel Dulaski | | | | |
|   By Mr. Greene | 8 | | 240 | |
|   By Mr. Aronson | | 223 | | |
|   By Mr. DiGangi | | 229 | | |

| EXHIBITS: | | PAGE |
|---|---|---|
| 1 - Daniel Dulaski, PhD, P.E. Report 9/14/2021 | | 56 |
| 2 - MassDOT Proposal | | 58 |
| 3 - 2015-08 Work Zone Crashes Involving Traffic Control Devices | | 95 |
| 4 - GPI Exhibit #15 | | 100 |
| 5 - B-61 K-Rail Test Results 11/22/1999 | | 109 |
| 6 - GPS Data Map | | 135 |
| 7 - GPI Exhibit #26 | | 157 |
| 8 - Brian Chase Report 8/13/2021 | | 159 |
| 9 - Hill & Smith Exhibit #43 | | 174 |
| 10 - Photo of Bent Pin | | 184 |
| 11 - Photo of Six Bent Pins | | 186 |
| 12 - Original Shop Drawings for Phase 2A | | 190 |
| 13 - Request for Information 4 6/17/2016 | | 197 |
| 14 - Certificate of Compliance 9/30/2015 | | 240 |

**Page 8**

P R O C E E D I N G S

  THE REPORTER:  Okay.  We're on the record as of 10:03.
  And can you please raise your right hand for me?
  (Oath administered)
  THE REPORTER:  Thank you.
  THE WITNESS:  Thank you.
  DANIEL M. DULASKI
called as a witness, after having been first remotely duly sworn, was examined and testified as follows:
  DIRECT EXAMINATION
BY MR. GREENE:
Q.  Morning, Mr. Dulaski.  How are you?
A.  I'm great.  How are you?
Q.  I'm well.  My name is Matthew Greene, and I'm an attorney who represents J.H. Lynch in this action.  Have you ever been to a deposition before?
A.  I can't recall, Matt.  I'm not sure.  I know -- I can't recall being formally deposed.
Q.  Fair enough.  Then, we'll go through some ground rules that will hopefully allow us to proceed on the same page and do this in as streamlined a

**Page 9**

fashion as possible.  You've been sworn to tell the truth, and I'm going to ask a series of questions to which you are going to respond under the pains and penalties of perjury.  Is that understood?
A.  Yes.
Q.  If at any point you don't understand my question, either spoken too quickly or just doesn't make sense to you, just ask me.  I'll be happy to repeat or rephrase it.  Is that fair?
A.  Yes.
Q.  However, if you give a response to my question, I will understand that to be indicative that you understood my question and answered to the best of your ability.  Is that also fair?
A.  Yes.
Q.  All right.  If at any point you want to take a break that's fine.  This is not a torture session.  I would just ask that you respond to the question that's pending before we actually take the break; is that fair as well?
A.  Yes.
  MR. GREENE:  All right.  Counsel, are we going to agree to the same stipulations as the

## Page 78

1  your report, to discuss the California K-Rail
2  and the New -- the TxDOT New Jersey barrier; is
3  that right?
4  A.  Yes, sir.
5  Q.  And you mention that they are significantly
6  heavier than the Zoneguard barrier, correct?
7  A.  Six and a half times heavier.
8  Q.  Sure. And I see that you've calculated the
9  weight in a number of different configurations,
10 right?
11 A.  Yes, sir.
12 Q.  Did you perform any calculations as to how they
13 would perform differently under different crash
14 scenarios?
15 A.  I didn't need to. NCHRP 350 and MASH did that
16 for us.
17 Q.  Well, that's not an answer to my question, and
18 we'll get on to other people's calculations you
19 relied upon. I'm asking you, did you perform
20 any calculations as to how either of these
21 concrete barriers would have performed under
22 different crash scenarios?
23 A.  Again, I'm going to rely on NCHRP 350 and MASH.
24 Q.  Okay. So it's fair to say that you personally

## Page 79

1  as an expert in this case performed no
2  calculations as to how these concrete barriers
3  would perform under different test scenarios; is
4  that right?
5  A.  I may not have done calculations, but I can tell
6  you which barrier I would want to be behind or
7  which barrier I'd want to -- would want to put
8  workers behind when it's on the ground in the
9  situation that we had.
10 Q.  I'm sorry. That's not my question. My question
11 is, did you perform any calculations as to how
12 either of these concrete barriers would perform
13 under different crash scenarios?
14 A.  No. I'm relying on NCHRP 350 and MASH.
15 Q.  And taking a step backwards from just these
16 concrete barriers, to inform your opinions of
17 this case, did you perform any calculations of
18 how different vehicles or barriers would perform
19 under different crash scenarios?
20 A.  Again, I relied on the information from FHWA and
21 their website that lists all of the barriers and
22 the test -- tests performed.
23 Q.  Okay. We'll get to other people's calculations
24 that you relied upon. But again, I'm asking for

## Page 80

1  the purposes of compiling your report and
2  preparing your opinions in this case, did you
3  personally do any calculations whatsoever as to
4  how different barriers or vehicles would perform
5  under different crash scenarios?
6  A.  I did not.
7  Q.  Now, you've mentioned that you relied on NHRCP
8  [sic] testing and MASH testing. Which testing
9  and calculations did you rely upon for the
10 purposes of your analysis?
11 A.  It depended on the barrier and it depended on
12 what was provided on FHWA's website.
13 Q.  Well, I'm asking you what specifically you
14 relied upon in your analysis in this case. I
15 don't understand why it depended on something.
16 A.  So it -- I assumed they are not --
17     MR. MCCORMACK: Was that a question,
18 Matt?
19     MR. GREENE: Yes. It is. And he's
20 answering.
21     MR. MCCORMACK: You said I don't
22 understand. That's not a question.
23     MR. GREENE: He's answering. He was
24 answering until you cut him off.

## Page 81

1  A.  I'm relying on --
2      (Simultaneous speech)
3  A.  I'm relying on NCH --
4  Q.  Please continue.
5  A.  I'm relying on NCHRP 350 and MASH.
6  Q.  Okay. You said you went on the FHWA website.
7  Let's start there. Is that right?
8  A.  Yes.
9  Q.  Okay. And then what did -- what testing -- what
10 data did you rely upon that was available on the
11 FHWA website?
12 A.  So similar to -- similar to the shop drawings
13 that were submitted for the Zoneguard, other
14 barrier manufacturers have tested or have hired
15 people to test the barriers, and if approved
16 under FHWA, NCRHP 350, or MASH, they're -- that
17 information is included on FHWA's website.
18 Q.  Okay. So what information would be included?
19 A.  So similar to the shop drawings that were
20 submitted for this particular case, it shows the
21 different barriers under different testing
22 conditions.
23 Q.  Okay. So would the testing be -- conditions be
24 TL-3?

### Page 226

1  deflection more significant than maximum
2  permanent deflection?
3  A. I'd say they're both important, but as a -- as a
4     driver, to have anything coming over into my
5     lane from the opposite lane when I'm not
6     expecting it is troublesome.
7  Q. And that would be reflected in the maximum
8     dynamic deflection figure, correct?
9  A. That would be in the maximum dynamic deflection.
10    Yes, sir.
11 Q. From a safety standpoint, which type of
12    deflection is more significant?
13 A. Well, they're both -- they're both telling
14    because, you know what, if something's on the
15    other side like a lane of traffic or some
16    workers, that dynamic given this scenario is
17    worse than the permanent. Okay? So that
18    dynamic would be of concern.
19 Q. Now, during the course of your work, after you
20    were retained in this case, did you have an
21    opportunity to review TL-3 test results for the
22    California K-rail and the TxDOT New Jersey
23    barriers?
24 A. So I reviewed, as the other attorney pulled up

### Page 227

1  today, the B-61 from FHWA. And I believe I
2  looked at TxDOT as well.
3  Q. I didn't see that in your file, but you believe
4     you did review it at some point in time?
5  A. I -- I'm pretty sure I found the link somewhere.
6     I believe it was an older -- older test.
7  Q. Okay. And what is the maximum dynamic
8     deflection in the TL-3 testing of the K-cal
9     [sic] in terms of inches?
10 A. So on the K-rail, the maximum dynamic was
11    somewhere around 10 inches, plus or minus.
12 Q. What was the maximum dynamic deflection on the
13    TxDOT New Jersey barrier?
14 A. That I don't remember.
15 Q. If I suggested to you it was 15 inches, would
16    that sound consistent with your memory or would
17    that refresh your memory?
18 A. That sounds perhaps reasonable.
19 Q. And both of those figures exceed three inches,
20    correct?
21 A. Both were identified in the standard
22    specifications as an acceptable barrier.
23 Q. No. I'm not asking you that. I'm asking you,
24    those figures exceed three inches, correct?

### Page 228

1  A. That's correct.
2  Q. And you just said that those were acceptable
3     barriers in the specifications, correct?
4  A. Yes, sir.
5  Q. If that provision was not in those
6     specifications, those barriers would have been
7     noncompliant, correct?
8  A. That's correct.
9  Q. In your review of the accident scenario, you
10    determined what struck or came into contact with
11    Mr. Hopkins' vehicle; is that right?
12 A. From the photos.
13 Q. What did you determine came into contact with
14    his vehicle?
15 A. It looked like the tractor-trailer from the
16    other side of the roadway.
17 Q. And how far did that tractor-trailer or the
18    tractor encroach upon Mr. Hopkins' lane?
19 A. I'm not at liberty to say because I didn't have
20    a scale or something that was scalable in
21    the -- in the image.
22 Q. I understand you might not know the specific
23    distance. Can you give us an approximation
24    based on your review of photographs?

### Page 229

1  A. Recollection is a couple of feet.
2  Q. Two feet?
3  A. Two plus, let's say.
4        MR. ARONSON: Okay. Thank you, Mr.
5     Dulaski. I have no other questions.
6        THE WITNESS: Thank you.
7        DANIEL M. DULASKI
8  testified as follows on:
9        CROSS-EXAMINATION
10 BY MR. DIGANGI:
11 Q. Mr. Dulaski, my name is Tom DiGangi. I
12    represent Northeast Traffic Control Services.
13    I'm just going to refer to that entity as
14    Northeast. Do you know what I mean?
15 A. Yes, sir.
16 Q. Okay. Can you see me okay?
17 A. No. Just the side of your head.
18 Q. Sorry about that.
19 A. We've been watching you read your notes and
20    everything else all day. There you go.
21 Q. That's not necessarily a detriment to you. Can
22    you tell me what Northeast's role was in the
23    Route 146 project?
24 A. My understanding was they were going to be the

250

1      C E R T I F I C A T E
2
3    COMMONWEALTH OF MASSACHUSETTS
4    COUNTY OF BRISTOL, SS
5        I, Laurie Donatella, a Professional Court Reporter
6    and Notary Public in and for the Commonwealth of
7    Massachusetts, do hereby certify that the foregoing audio-
8    visual deposition of Daniel M. Dulaski, PhD, was taken
9    remotely before me on December 15, 2021.  The said witness
10   was satisfactorily identified and duly sworn before the
11   commencement of his testimony; that the said testimony was
12   taken audiographically by myself and then transcribed
13   under my direction.  To the best of my knowledge, the
14   within transcript is a complete, true and accurate record
15   of said deposition.
16       I am not connected by blood or marriage with any of
17   the said parties, nor interested directly or indirectly in
18   the matter in controversy.
19       In witness whereof, I have hereunto set my hand and
20   Notary Seal this 20th day of December 2021.
21
22
23
24